FILED

2021 Mar-31  AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TEDD WILSON,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| | } | |
| **v.** | } | **Case No.:  5:20-cv-00324-MHH** |
| | } | |
| | } | |
| **STATE FARM GENERAL** | | |
| **INSURANCE COMPANY,** | | |
| | | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

In this insurance coverage dispute, Mr. Wilson alleges that State Farm wrongfully refused his claim for policy benefits after he lost a set of baseball cards that State Farm insured.  (Doc.1, pp. 2–3, ¶¶ 5–10).  State Farm has asked the Court to dismiss Mr. Wilson's complaint.  (Doc. 18).  Because State Farm offered transcripts of Mr. Wilson's examinations under oath in support of its motion to

dismiss, the Court converted State Farm's Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment.  (Doc. 34).[1]

In this opinion, the Court will explain the rules that govern State Farm's motion for summary judgment, review the evidence in the record, and decide whether Mr. Wilson's state law claims for breach of contract and bad faith failure to pay an insurance claim survive summary judgment.  The Court also addresses Mr. Wilson's request to conduct limited discovery.

---

[1] State Farm has asked the Court to reconsider its decision to convert the motion.  (Doc. 36).  State Farm argues that the Court may consider Mr. Wilson's examinations under oath in the context of a motion to dismiss because the EUOs are undisputed and central to Mr. Wilson's claim.  (Doc. 36, pp. 3–4).  In *Korman v. Iglesias*, in evaluating a motion to dismiss, the Eleventh Circuit Court of Appeals concluded that the district court could consider depositions at the motion to dismiss stage without converting the motion to dismiss into a motion for summary judgment, but the Court of Appeals held that the decision to convert was discretionary.  778 Fed. Appx. 680, 682 (11th Cir. 2019).  The Eleventh Circuit cited *Day v. Taylor*, 400 F.3d 1272 (11th Cir. 2005), for the proposition that a district court may consider materials attached to a motion to dismiss that are central to the plaintiff's claim and undisputed.  778 Fed. Appx. at 682.  In *Day*, the Eleventh Circuit considered a contract attached to a motion to dismiss, not deposition testimony.  *See Day*, 400 F.3d at 1276 (considering a "form dealership contract").  The Court maintains its decision to convert State Farm's motion to dismiss into a motion for summary judgment because the Court believes the EUOs are better examined as evidence in support of State Farm's defense to Mr. Wilson's claims for breach of contract and bad faith.

# I.

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The Court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018). Accordingly, the Court views the summary judgment evidence in this case in the light most favorable to Mr. Wilson.[2]

---

[2] Mr. Wilson currently is not represented by an attorney in this case, but an attorney drafted his complaint and filed the complaint on his behalf. (Doc. 1, p. 5). Therefore, in evaluating the legal claims in Mr. Wilson's complaint, the Court will not use the lenient standard that governs *pro se* pleadings. *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *see also Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) ("Pro se pleadings are held to a less stringent standard than pleadings drafted by

## II.

Mr. Wilson loves baseball cards.  A self-described "big-time collector," Mr. Wilson has hundreds of cards, including numerous Hall of Famers.  (Doc. 18-7, p. 6–7, tpp. 16, 18–19).  Sometimes Mr. Wilson buys entire collections from people looking to offload their cards.  (Doc. 18-7, p. 8, tp. 21).  Other times, he cherry picks "the good stuff."  (Doc. 18-7, p. 8, tp. 21).  While he rarely trades or sells his own cards, if someone "is in love with something that I have and they're willing to really, really, really pay and, you know, they really, really want it and I can get absolute top dollar, of course I'm going to do that."  (Doc. 18-7, p. 9, tp. 26).  Mr. Wilson views himself as "an expert . . . one of the top experts of the world" on baseball cards, so he did not obtain written appraisals of his insured baseball cards.  (Doc. 18-7, p. 12, tp. 34).  Mr. Wilson has been in the baseball card business for 45 years.  (Doc. 18-7, p. 12, tp. 36).

Mr. Wilson travels with his baseball cards.  On March 29, 2018, Mr. Wilson flew from Huntsville, Alabama to Las Vegas, Nevada, landing between 8:00 p.m. and 8:30 p.m.  When he arrived in Las Vegas, he hailed a cab.  (Doc. 18-7, pp. 41–42, tpp. 135–37).  Mr. Wilson brought with him approximately 40 baseball cards,

---

attorneys and will, therefore, be liberally construed.").  To the extent that the Court considers arguments and evidence that Mr. Wilson has presented since his attorney withdrew, the Court will be mindful of the fact that Mr. Wilson is not a licensed attorney.

including approximately 30 insured cards, which he carried in a zipped canvas bag. (Doc. 18-7, p. 44, tp. 143).  He explained he brought the cards to Las Vegas with him, cards he values at over $150,000, because he is responsible for them, and leaving them at home would put his partner "under enormous stress."  (Doc. 18-7, pp. 43, 52, tpp. 140, 170).

Mr. Wilson typically carried his cards in a brown satchel.  (Doc. 18-7, p. 13, tp. 39).  He would normally put some of the cards in bricks, a half-inch thick piece of plastic or plexiglass used to protect and display the cards.  (Doc. 18-7, p. 13, tpp. 39–40).  On March 29, Mr. Wilson had four cards encased in bricks, and the others in sleeves in his satchel.  (Doc. 18-7, p. 14, tp. 43).  When he checked into his hotel, he realized his baseball cards were missing.  (Doc. 18-7, p. 42, tpp. 137–39).  After retracing his steps through the hotel, he called the cab company to report the loss. (Doc. 18-7, p. 43, tp. 140).  The dispatcher with whom he spoke told him she would reach out to the driver.  (Doc. 18-7, p. 43, tp. 140).  The driver reported that he did not see anything in the cab.  (Doc. 18-7, p. 43, tp. 141).

Mr. Wilson called the cab company again the next day, hoping someone would have turned in his bag of baseball cards, and the dispatcher told him to leave a voicemail on the company's lost and found voice system.  (Doc. 18-7, p. 43, tp. 141).  Mr. Wilson left the voicemail and never heard back.  (Doc. 18-7, p. 43, tp.

141).  Mr. Wilson called the cab company a third time and then filed a police report

with the Las Vegas Metropolitan Police Department.  (Doc. 18-7, p. 44, tp. 142).

The 30 or so cards that were insured were covered by a "Personal Articles

Policy" of insurance, effective from July 25, 2017 through July 25, 2018.  (Doc. 18-

1, p. 3).  The policy covered "Collectibles," had an annual premium of $1,171, and

provided coverage in the amount of $156,115.  (Doc. 18-1, p. 3).  The policy

provisions relevant to Mr. Wilson's claim in this action include the following under

the heading "**CONDITIONS**":

> 2. **Concealment or Fraud.**  This entire policy will be void if, whether before or after a loss, you have intentionally concealed or misrepresented a material fact or circumstance relating to this insurance.

(Doc. 18-1, p. 9, ¶ 2).

> 7. **Your Duties After Loss.**  In case a covered loss occurs, you must:
>
> > a. protect the property from further loss and take all steps possible to minimize the loss.  Expenses incurred will be borne by you and us proportionate to our respective interests;
> >
> > b. report as soon as practicable in writing to us or our agent any loss or damage which may become a claim under this policy (In case of theft, the police are also to be notified); and
> >
> > c. file with us or our agent, within 90 days after discovery of the loss, a signed sworn proof of loss.  This will state the facts and amount of the loss to the best of your knowledge.

(Doc. 18-1, p. 10, ¶ 7).

8. **Examination Under Oath.**  You agree:

> a. to be examined under oath and subscribe to the same as often as we reasonably require;
>
> b. that employees, members of your household or others will be produced for examination under oath to the extent that it is within your power to do so;
>
> c. to produce, if requested, the remains of the covered property; and
>
> d. to produce such records as we may need to verify the claim and its amount, and to permit copies of such records to be made if needed.

(Doc. 18-1, p. 10, ¶ 8).

19.  **Intentional Acts.**  If you or any person insured under this policy causes or procures a loss to property covered under this policy for the purpose of obtaining insurance benefits then this policy is void and we will not pay you or any other insured for this loss.

(Doc. 18-1, p. 11, ¶ 19).

State Farm exercised its option under its policy to examine Mr. Wilson under

oath.  On January 17, 2019, Mr. Wilson sat for his first examination.  (Doc. 18-7).

Counsel for State Farm explained the reason for the examination:

> State Farm has previously notified you that questions of coverage has arisen concerning this claim.  State Farm is conducting this investigation to resolve these and other possible questions of coverage while reserving its right to deny coverage for this loss in the event that the investigation reveals that a breach of the policy contract or violation of Alabama law has occurred in connection with this claim.

(Doc. 18-7, p. 5, tpp. 10–11; *see also* Doc. 19, p. 14).  State Farm asked Mr. Wilson

to bring to his examination information regarding "the date of the purchase and the

7

identities and contact information for the persons or businesses from which the baseball card collection was purchased or acquired." (Doc. 18-7, p. 15, tp. 44). Mr. Wilson did not bring responsive information with him and explained that he did not receive receipts for the insured cards when he purchased them and that all purchases were made in cash. (Doc. 18-7, pp. 8, 12, 15, tpp. 21–23, 34, 44–45).

In its pre-EUO letter, State Farm asked Mr. Wilson to provide "a copy of the incident report from any fire or law enforcement agency pertaining to any previous fire or theft of your property within the last ten years." (Doc. 18-7, p. 15, tp. 47). To Mr. Wilson, "[t]his is very upsetting" because, according to him, State Farm "moved the goalposts." (Doc. 18-7, p. 15, tp. 47). In an earlier letter, State Farm had asked Mr. Wilson for this information going back five years, but it then asked him for the information going back ten years. (Doc. 18-7, p. 16, tp. 48). Mr. Wilson told State Farm that "[i]t doesn't matter" whether he had that information "[b]ecause when [he] bought the policy, [State Farm] asked [him] to go back three years." (Doc. 18-7, p. 16, tp. 49). While Mr. Wilson stood by his statement that he had no fire or theft claims between 2013 and 2016, he stated that "to go back any further would be to me a breach of contract." (Doc. 18-7, p. 16, tp. 50).

He refused to answer State Farm's question regarding claims for fire or theft

going back ten years, consistently stating that the question was irrelevant:

Q:     So, Mr. Wilson, obviously this application was taken and it was
       before any claim was made.  And I'm not here to argue any law
       -- any points of law.  We're here to investigate.  I'm here to ask
       you questions about the claim and if there are any other relevant
       claims that have been made, whether it was five years, ten years
       or twenty years.  In this case, I see where it has changed from
       five to ten.  But what I'm asking you is --

A:     Well, I'm going on the advice of my attorneys that I've
       previously talked to that this is an inconsistent question and that
       you're moving the goalposts.  And I have to stay within the
       application, you know, within the application that I signed.  We
       both have to live with the contract, not just me.

Q:     Just to clarify.  You're just saying -- you're saying you refuse to
       answer any questions beyond five years?

A:     Right.  I'm going back three years from 2016, July of 2016,
       which is July of 2013.  I'm fine with that, totally fine.  But if you
       want to ask ten or fifteen or twenty years, you have to put it in
       the application and then let me ponder it.  And, you know, let me
       pull my records and if there's something -- let me know up front,
       not after the fact.

       *     *     *

Q:     So what happens now is when a claim has been made, then you
       have to determine if there's any prior claims that have been made
       in the past five, ten, fifteen that are relevant to this claim.
       Because if they are, then State Farm would be -- would need to
       know about that as a part of the investigation.

A:     Then they have to put it in the application and let me know up
       front.

       *     *     *

9

Q:    No, I understand.  But what I'm trying to explain to you is based on the contract with State Farm, based on the contract you signed with this Personal Articles Policy, you're required to answer these questions under examination -- under this examination under oath, whether it's five years, ten years or fifteen years. And I'm letting you know -- understand that and I want to make sure that I'm getting it correct -- I want to make sure that I'm understanding your answer.

A:    Like I said, I'm following the advice of my attorney sand they're saying that I have to abide by the contract that I signed.  And I'm doing that.

            *        *        *

Q:    I just wanted you to understand that based on the Personal Articles Policy, there is no limitation in time.  It generally says -- I'm sorry, it specifically says to produce such records as we may need to verify the claim and its amount.  There's no time period.  There's no within three years, five years, within ten.  The Personal Article Policy --

A:    Well, then they're going to have to say that clearly like they can go back X number of years.  And they don't have that anywhere. It doesn't say that anywhere.

Q:    And I understand that you may not agree with it.  I need you to understand or I need to -- I'm just -- I'm telling you that that's what the policy says.

A:    Well, you see, they moved the goalposts.  I showed you that they initially asked for five years and they changed to ten years.  Now, that's inconsistent according to attorneys.  You're an attorney. But I'm still answering the question the way it should be answered.  Because like I said, I took this to the insurance company, I showed them the question and that's how they answered it.  And I couldn't agree more.  They're honest -- the lady was an honest lady.

(Doc. 18-7, pp. 23–25).

Counsel for State Farm explained to Mr. Wilson that "there is no time frame of . . . relevancy" for the records or documents State Farm could request from Mr. Wilson in the process of verifying his claim. (Doc. 18-7, p. 53, tp. 173). Still, Mr. Wilson refused to answer, or qualified his answers, concerning whether he had owned insured cards in the past. (*See* Doc. 18-7, p. 58, tp. 190) ("Whether I had them previously or not is irrelevant. I had them when I walked into the door to have them insured, that's when I had them. And I had photos of it and I brought them in to show the people. There's not much more I could do.").

State Farm and Mr. Wilson agreed to continue the examination under oath on February 27, 2019. (Doc. 18-2, p. 2). Counsel for State Farm began by again trying to clarify the scope of the investigation:

Q: So, Ted, what I'm trying to explain is that there is no three year limitation on any claims or any suits.

A: Do you have a copy of the application that was presented during our last EUO?

Q: We do, Ted. It's Exhibit 2 of the prior. But Ted, the question on the table is do you understand the policy and that it does not limit the request to three years?

A: I don't see that anywhere.

Q: So what I'll do is I'll just reference you back to the policy. The section that I just described on page 4, section 8, examination under oath, section D says "You agree to produce such records as we may need to verify the claim and its amount." Do you agree that the policy says that?

11

A:     Well, I'm sure it does, but I don't see it.  You're not showing that to me at the moment.

Q:     Here Ted.  This is what you were just looking at.  Here is Exhibit 3.  This is page 4, section 8 under examination under oath, subsection D.

A:     (Witness perusing document.)  Yeah, you just showed this to me. Yeah.

Q:     So do you agree that is what the policy says?

A:     Yeah.

Q:     Okay.  Thank you, Ted.  Ted, do you understand that the State Farm policy requires you to answer my questions truthfully and completely?

A:     Yes.

Q:     Do you understand that refusing to answer questions could result in a denial of your claim?

A:     Depends on the question.

Q:     So, Ted, I'll just ask again.  Do you understand --

A:     Depends on the question.  You can't ask me something that is illegal or it doesn't reflect an application that we both agreed on. We signed a contract.  Both people have to live up to the contract. You can't move the goal post, which is what you did last time.

(Doc. 18-2, pp. 11–13).

Mr. Wilson refused to authorize State Farm to collect and review his phone records to corroborate his statements to the police and his statements in his insurance claim:

Q:     So, Ted, what I'm asking you to do is to sign this authorization form so that we can collect the phone records.  Those phone records could substantiate or coordinate with the police report,

your statements in the police report.  Will you agree to sign the authorization?

A:     I told you I just don't sign blank authorizations.  It's just my habit not to sign a blank authorization.

Q:     So you're refusing to sign Exhibit 16?

A:     It's irrelevant.  We have the information.  It's been already checked out.  There is no reason to check my phone records.  You already know that I called at a specific time.  You have the information already.

Q:     Ted, I don't know.  I know based on your statements.  I know what you have told me and what you have told the Las Vegas PD.

                  *         *         *

Q:     Ted, there are no documents I have seen that confirm the conversations, the calls, and I know if we had your records we could confirm your calls to the cab company and we could confirm your calls --

A:     You have that.

                  *         *         *

Q:     If you got the phone records, we could confirm that.  That is why I'm asking you to sign.

A:     Well, again, it's irrelevant.  You're asking me for repetitive information.  You have that information already.

                  *         *         *

Q:     All I'm doing is I'm asking would you be willing to provide those documents if you can access them?

A:     This, to me, is irrelevant.

Q:     I understand that, but if you'll just answer the question yes or no --

13

A:     I'll have to consult with my attorney.  I'll consult with my attorney.

Q:     All right.  Let me ask it again and let me make sure we get this right.  So in response to my request for your Metro PCS phone records, your response is what, Ted?

A:     It's irrelevant.  It's harassment.  It's an invasion of privacy, and it's unnecessary.  And you have the information already.  It's not information that you don't have.   You already have the information.  So why are we doing this?

Q:     I don't have it, Ted.

A:     You do have it.  You do have it.  You're incorrect.

Q:     I don't have your call log.

A:     You don't have my call, but you know the times.  You know who I spoke to.

(Doc. 18-3, pp. 14–16, 18–19).

Mr. Wilson also failed to provide notes of his conversation with Las Vegas Police Department Detective Byrd.  (Doc. 18-3, pp. 23–26).  He failed to provide contact information for his mortgage holder.  (Doc. 18-3, p. 27) ("I don't -- if you need any information about my payments, anything along those lines, those, I will bring in.  If you are asking just to talk to him about my personal business, then no, I would object.").  He objected to providing information about previous employers.  (Doc. 18-3, p. 31) ("It's irrelevant.  You can't go back forty years here.  This is an outrage.  You're trying to go back forty years.  This is an outrage.  This is a total outrage.  This is a scam you're running, literally . . . I am kind enough to come here

14

without an attorney and let you badger me and ask me idiotic questions.  And that is

an idiotic question.  Let's stay on the subject, can we?").

Counsel for State Farm also asked about Mr. Wilson's history of litigation:

Q:     Let's move onto the next big subject.  So the next one is have
       you ever been sued?

A:     I'm trying to think.  I like to say never is the word that pops up
       in my mind, but could have been something real small that my
       lawyer just got rid of or something that I wasn't even aware of.

Q:     Ever been sued?

A:     I don't recall ever being sued.

Q:     Don't recall.  What about have you ever sued anyone else?

A:     Not very often, I can tell you that.  I don't like to use the word
       "ever" at my age, you know.

Q:     Ever sued anyone else?

A:     I don't like to go back "ever."  What happened in the '70s or '80s,
       I just don't even -- it's not even in my mind anymore.

Q:     Have you sued anyone in the last twenty years?

A:     I don't recall.   Maybe something minor.   Could have been
       something minor or something.  I don't know.  Maybe.  Not a
       large -- nothing large, that I can recall.

Q:     So let's talk about the small that you recall.

A:     I don't recall. I said it could be something small.  My lawyer may
       have handled it and then blew it off or nickels and dimes.  I don't
       know.  Something nickels and dimes possibly.

Q:     So ever sued anyone else?

A:     I don't recall.

(Doc. 18-3, pp. 35–36).[3]

---

[3] The Court takes judicial notice of other lawsuits in which Mr. Wilson has been involved regarding claims for lost baseball cards. *See* FED. R. EVID. 201(b); *Russell v. United States*, --- Fed. Appx. ---, 2021 WL 320809, at *2 (11th Cir. Feb. 1, 2021) ("We may also take judicial notice of a document filed in another federal or state court 'to establish the fact of such litigation and related filings.'") (quoting *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)).

In April 2006, Mr. Wilson sued Vigilant Insurance Company in Florida state court. (Doc. 18-5, p. 2). Vigilant sold Mr. Wilson an insurance policy for $268,000, and in January 2005, Mr. Wilson alleged that he lost approximately 46 baseball cards while in transit from his home in Fort Lauderdale, Florida to Las Vegas, Nevada. (Doc. 18-5, pp. 2–3, ¶¶ 4, 7). Mr. Wilson filed his claim with Vigilant, which Vigilant denied. (Doc. 18-5, p. 3, ¶¶ 8–9). Vigilant answered Mr. Wilson's lawsuit, and argued that his recovery was "barred because he failed to cooperate with Vigilant in its investigation of the claim, as required by the terms of the policy of insurance." (Doc. 18-5, p. 7, ¶ 1). Mr. Wilson "failed to provide virtually any of the documentation requested by Vigilant to support his ownership of the baseball cards or to verify the circumstances surrounding the alleged loss or theft." (Doc. 18-5, p. 7, ¶ 1). He also "failed to comply with the terms of the policy . . . by consistently and repeatedly refusing to answer relevant and material inquiries from Vigilant's counsel at the Examination Under Oath . . . ." (Doc. 18-5, p. 8, ¶ 2). He "failed and refused to fully and truthfully answer relevant inquiries regarding his background, his employment history, his insurance history, his financial condition, the purchase history of the baseball card collection, his activities at the time of the loss, and the documentation and verification of his claim." (Doc. 18-5, p. 8, ¶ 2).

In June 2013, United National Insurance Company sued Mr. Wilson in the United States District Court for the Southern District of Florida. (Doc. 18-6, p. 2). United had issued to Mr. Wilson a Collector's Insurance Policy. (Doc. 18-6, p. 3, ¶ 6). In October 2011, Mr. Wilson notified United of an alleged burglary loss, resulting in the loss of collectible baseball cards. (Doc. 18-6, p. 3, ¶¶ 10–11). United's investigation of Mr. Wilson's claim revealed "at least two prior disputed insurance claims involving an alleged loss of collectibles, at least one of which was under circumstances substantially similar to the instant loss;" "witness statements in a prior insurance claim alleging that [Mr.] Wilson regularly solicits settlements of fraudulent insurance claims as a means of income;" and "the lack of any documentation supporting the purchase price, date of purchase, location of purchase, and/or condition of the subject baseball cards." (Doc. 18-6, pp. 5–6, ¶ 14). Throughout United's investigation of Mr. Wilson's claim, Mr. Wilson "refused to cooperate with and/or intentionally obstructed United['s] . . . investigation." (Doc. 18-6, p. 6, ¶ 15). He "repeatedly refused and/or otherwise failed to cooperate with United['s] requests for documentation, including requests for financial records and cellular phone records for the time period in question." (Doc. 18-6, p. 6, ¶ 16). Mr. Wilson also "repeatedly misrepresented the contents of communications" between himself and United, and "refused to submit to an Examination Under Oath . . . ." (Doc. 18-6, p. 6, ¶¶ 17–18).

On July 31, 2019, State Farm sent a letter to Mr. Wilson, telling him that the company denied his claim "due to your repeated violations of the Conditions to coverage under the policy in the investigation of this claim." (Doc. 18-8, p. 2). State Farm explained that Mr. Wilson "failed and refused to comply" with the policy, including making "numerous misrepresentations," refusing to "answer questions related to the claim," and "intentionally concealing relevant information." (Doc. 18-8, p. 3). Specifically:

> Mr. Wilson's misrepresentations, concealments, and refusals to answer include, but are not limited to, stating that he did not recall ever being sued or suing anyone else. Additionally, in his EUO, Mr. Wilson stated that he had never had a third party appraise any of his baseball cards. Also, Mr. Wilson refused to answer any questions about baseball cards outside those cards listed in the claim. Lastly, Mr. Wilson refused to answer questions regarding prior insurance claims and lawsuits. Additionally, Mr. Wilson refused to provide the requested cell phone records.

(Doc. 18-8, p. 3).

Mr. Wilson brought this action to obtain the coverage that State Farm refused to provide. He contends that State Farm breached its policy and that the breach was in bad faith.

17

## III.

To establish a breach of contract claim under Alabama law, Mr. Wilson must demonstrate "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Southern Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995) (citing *McGinney v. Jackson*, 575 So. 2d 1070, 1071–72 (Ala. 1991)). Under Alabama law, "[g]eneral rules of contract law govern an insurance contract." *Safeway Ins. Co. of Ala. v. Herrera*, 912 So. 2d 1140, 1143 (Ala. 2005).

If Mr. Wilson cannot demonstrate that he complied with his insurance policy's post-loss requirements, then State Farm is entitled to summary judgment on his breach of contract claim because he cannot establish his performance under the policy. In Alabama, "an insurer's obligation to pay . . . does not arise until the insured has complied with the terms of the contract with respect to submitting claims." *Nationwide Ins. Co. v. Nilsen*, 745 So. 2d 264, 267 (Ala. 1998) (citing *United Ins. Co. of Am. v. Cope*, 630 So. 2d 407, 411 (Ala. 1993)). Mr. Wilson's policy required him to submit to examinations under oath and to "produce such records as [State Farm] may need to verify the claim and its amount . . . ." (Doc. 18-1, p. 10, ¶ 8d).

18

It is undisputed that Mr. Wilson refused to provide a great deal of the information that State Farm requested to investigate his claim.  Mr. Wilson's effort to limit State Farm's investigation is not consistent with the plain language of his insurance contract.  For example, the Court accepts that in his application for coverage, Mr. Wilson had to satisfy only a three-year lookback period, but the policy does not include a three-year limitation on investigations of, for example, prior claims for baseball card losses.[4]  Mr. Wilson had plenty of time between his two EUOs to seek clarification from his attorneys so that he could withdraw his objections and respond to State Farm's requests for information.  Still, at his second EUO, he refused to answer State Farm's questions, and he did not provide documents and records as required by his policy.[5]

Because Mr. Wilson did not comply with his policy's post-loss requirements, as a matter of law, he cannot succeed on a claim for breach of contract. Consequently, the Court will enter judgement in favor of State Farm and against Mr. Wilson on Mr. Wilson's breach of contract claim.

---

[4] According to State Farm, since 1998 Mr. Wilson has submitted at least five separate insurance claims "that are almost identical to the one he submitted" in this litigation.  (Doc. 18, p. 2).

[5] State Farm's EUO provision contains a reasonableness limitation. (Doc. 18-1, p. 10).  On another record, there might be a situation in which the scope and length of an insurer's examination was unreasonable.  On the record in this case, because Mr. Wilson refused to answer so many of State Farm's questions during his two EUOs, the attorney conducting the examination reasonably pressed Mr. Wilson for any information that might help the company investigate Mr. Wilson's claimed loss.

Because Mr. Wilson's breach of contract claim fails as a matter of Alabama law, his bad faith claim fails too because he must establish a breach of contract to maintain a bad faith claim. *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982); *Nilsen*, 745 So. 2d at 269 (insured cannot sustain bad faith claim in the absence of a breach of contract); *Ex parte Alfa Mut. Ins. Co.*, 799 So. 2d 957, 962 (Ala. 2001) ("[A] breach of an insurance contract is an element of a bad-faith-refusal-to-pay claim."). Accordingly, the Court will enter judgment in favor of State Farm and against Mr. Wilson on Mr. Wilson's bad faith failure to pay claim.

## IV.

Mr. Wilson has asked the Court to allow him to conduct limited discovery before ruling on State Farm's motion. (Doc. 35). Mr. Wilson has identified three potential witnesses whom he wishes to depose: Lloyd Renfrow, a State Farm "Team Captain"; Robbie Barnes, the State Farm agent from whom Mr. Wilson bought his policy; and Jason Lee, the attorney who represented State Farm at Mr. Wilson's EUOs. (Doc. 35; *see* Doc. 18-7, p. 16, tp. 49). Mr. Wilson provided some questions he would ask these three witnesses if the Court were to permit him to take their depositions. (Doc. 35, pp. 2-7).

There are instances in which a party's need for discovery may delay a district court's consideration of a summary judgment motion. Fed. R. Civ. P. 56(d). This is not one of them. Rule 26(b)(1) allows a party to obtain discovery, including oral depositions, "regarding any nonprivileged matter that is relevant to any party's claim or defense." The relevant information need not be admissible at trial, provided discovery is "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). The rules do not require a party to justify taking a deposition, (*see* Fed. R. Civ. P. 30(a)(1)), but a district court may limit the "frequency or extent of discovery" when the discovery sought is unreasonably cumulative or can be obtained from some other source that is more convenient, less burdensome, or less expensive. Fed. R. Civ. P. 26(b)(2)(C)(i).

The depositions that Mr. Wilson requests will not assist the Court's analysis of his breach of contract and bad faith claims because the information he seeks is not relevant to his failure to fulfill his obligation to cooperate in State Farm's investigation of his claim. With respect to his request for the deposition of State Farm's attorney, Mr. Wilson first would have to demonstrate that he cannot obtain the information he requests from another source and that the information sought is

relevant, non-privileged, and crucial to the preparation of his case.  *Shelton v. Am.*

*Mot. Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986). [6]

None of the questions Mr. Wilson proposes asking Mr. Lee meets the criteria

for examination of a party's attorney.  For example, Mr. Wilson would like to ask

Mr. Lee why he continued to ask Mr. Wilson "to point out where on the application,

does it ask if you had a claim in the previous three years when its right in the middle

of the page," and why Mr. Lee failed to follow his law firm's guidelines for the EUO,

an apparent reference to Mr. Wilson's allegations that State Farm moved the

goalposts throughout its investigation.  (Doc. 35, p. 6).  Mr. Wilson contends that

"[State] Farm repeatedly lied on there [*sic*] denial letter," and he calls Mr. Lee

unprofessional for asking questions Mr. Wilson believes exceeded the scope of the

EUO.  (Doc. 35, p. 8).  Mr. Wilson is not entitled to answers regarding Mr. Lee's

thought processes in formulating his questions during Mr. Wilson's EUOs.  And Mr.

Wilson's characterization of State Farm's letter and Mr. Lee's examination is not a

---

[6] *See also* Douglas R. Richmond, *Depositions of Other Lawyers*, 81 TENN. L. REV. 47, 77 (2013) ("Courts generally disfavor depositions of opposing counsel even though rules of civil procedure permit them.  Depositions of opposing counsel may extend litigation and increase its cost, cause delays to resolve work-product and attorney-client privilege objections, distract the lawyer to be deposed from the client's representation, discourage parties from communicating openly with their lawyers, function as a backdoor method of learning the opponent's litigation strategy, or be an effective means of harassing opposing counsel and their clients.").  State Farm argues that a deposition of Mr. Lee is "barred by the attorney-client privilege and work product doctrine."  (Doc. 36, p. 6 n.7).  While Mr. Lee is not trial counsel in this action, many of the concerns identified by Mr. Richmond would arise if Mr. Wilson were to depose Mr. Lee.

question for discovery; it is an argument.  Mr. Wilson has not identified a legitimate basis for deposing Mr. Lee.

The questions Mr. Wilson seeks to pose to Mr. Renfrow and Mr. Barnes would not lead to the discovery of information to refute State Farm's evidence regarding Mr. Wilson's failure to meet his post-loss obligations under his insurance policy. Mr. Wilson would like to ask Mr. Renfrow, for example, why State Farm never sent him a proof of loss form, why Mr. Renfrow told him that he could sign the proof of loss form during his EUO, whether Mr. Renfrow was aware that a third-party appraisal was not required for Mr. Wilson's policy, and why his (Mr. Wilson's) original EUO was postponed.  (Doc. 35, pp. 2–3).

Mr. Wilson would like to ask Mr. Barnes, for example, what happened to the photographs of Mr. Wilson's insured cards that Mr. Wilson believes Mr. Barnes possessed, what happened to the original insurance contract (or, possibly, the application for insurance) that Mr. Wilson signed in July 2016, why Mr. Barnes closed his State Farm office after Mr. Wilson's final EUO, and whether State Farm told Mr. Barnes to destroy documents related to his claim.  (Doc. 35, pp. 4–5).

These questions, and the information that Mr. Renfrow or Mr. Barnes potentially could provide to Mr. Wilson, would not address Mr. Wilson's failure to comply with his policy's post-loss requirements.  Mr. Wilson was obligated to

provide documents and information to State Farm.  His failure to do so dooms his breach of contract claim under Alabama law.  None of the information he seeks through his proposed questions to his three proposed witnesses changes that.

The Eleventh Circuit Court of Appeals has explained that "a [district] court may grant summary judgment without parties having conducted discovery if . . . the court has, in valid exercise of discretion, denied [] a motion," for discovery.  *Smedley v. Deutsche Bank Trust Co. Americas*, 676 Fed. Appx. 860, 862 (11th Cir. 2017) (quoting *Reflectone, Inc. v. Farrand Optical Co.*, 862 F.2d 841, 844 (11th Cir. 1989)).  And a district court does not abuse its discretion in declining to grant a Rule 56(d) continuance when "the necessary information to defeat summary judgment [is] generally accessible to [the party] without discovery."  *Cline v. Tolliver*, 434 Fed. Appx. 823, 825 (11th Cir. 2011).

To survive summary judgment, Mr. Wilson needs to provide evidence demonstrating he complied with the post-loss obligations of the policy.  The Court provided Mr. Wilson several weeks to submit such evidence, and he has not done so. (Doc. 34).  Because the evidence in the record shows that Mr. Wilson repeatedly failed to answer State Farm's questions as State Farm investigated his claim, and Mr. Wilson has not offered evidence to prove that State Farm exceeded the contractual scope of its investigation, State Farm is entitled to judgment as a matter

24

of law.  Therefore, the Court denies Mr. Wilson's request to conduct discovery. (Doc. 35).

## Conclusion

For the reasons above, State Farm is entitled to summary judgment on Mr. Wilson's breach of contract and bad faith failure to pay claims.  By separate order, the Court will enter final judgment and close this case.

**DONE** and **ORDERED** this March 31, 2021.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE